IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GJP ENTERPRISES, INC., d/b/a AMERICAN DECORATIVE CEILINGS, | ) ) ) | CASE NO.  1:05CV0670 |
| Plaintiff, | ) ) | MAGISTRATE JUDGE HEMANN |
| v. | ) ) ) | |
| PERFORMANCE CONTRACTING, INC., | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) ) | Docket #23 |

This case is before the magistrate judge on consent.  Pending is the motion of defendant, Performance Contracting, Inc. ("PCI"), for summary judgment on the complaint of plaintiff, GJP Enterprises, Inc., American Decorative Ceilings ("ADC"), and for partial summary judgment on PCI's counterclaim ("Def. mot."; Docket #23).  ADC opposes defendant's motion ("Pl. opp."; Docket #31).  For the reasons given below the court grants PCI's motion in its entirety.

### I.  Background

The court views the facts, as it must, in the light most favorable to the party opposing the motion for summary judgment.  ADC alleges or does not deny the following facts.

ADC is an Ohio corporation with its principal place of business in Cuyahoga Heights, Ohio.  ADC manufactures ceiling panels for office and institutional use.  Defendant PCI is a Kansas corporation with its principal place of business in Charlotte, North Carolina.  PCI has an office in Cincinnati and regularly conducts business in Ohio.

The Green River Community College construction project ("Green River project" or

"the project"), located in Auburn, Washington, was a commercial construction project for which Graham Contracting, Inc. ("Graham") served as general contractor.  In 2003 PCI won from Graham the subcontract to install acoustical ceiling panels for the project.  PCI solicited bids for the ceiling tiles needed to perform the subcontract.  On October 31, 2003 ADC submitted a bid of $174,557, including wooden and metal ceiling tiles and ceiling components needed to install and suspend the tiles.  Defendant PCI's Notice of Filing of Documents Referenced in Transcripts ("Documents"; Docket #37), p. PCI-00327.  The bid also provided that this price was good through January 3, 2004 and warned in capital typeface at the bottom of the page, "BECAUSE THIS IS A NON-STOCKING DESIGN, COLOR, AND/OR QUANTITY, A DEPOSIT OF 35% WILL BE REQUIRED AT TIME OF ORDER PLACEMENT."  *Id.*  In late 2003 PCI notified ADC by a letter of intent that ADC had won the subcontract for the tiles.

On July 22, 2004 ADC sent PCI an invoice for $70,000 for "deposit due on estimated order."  *Id.* at PCI-00333.  Ronald Blain ("Blain"), an estimator and project manager for PCI, approved the payment.  *Id.*

On August 3, 2004 PCI sent ADC a facsimile purchase order numbered 47572 for a suspension system and ceiling panels for the Green River project.  The purchase order was in the amount of $174,557.00.  The purchase order instructed ADC to start engineering and manufacturing the ceiling panels subject to the terms and conditions located on the front and back of the order.  The front of the purchase order set forth the delivery date as June 30, 2004 and provided for payment 45 days after delivery.  The front of the purchase order also stated:

This order is subject to and upon the terms and conditions on the reverse side,

2

which together with the face hereof shall constitute the complete and final agreement between Buyer and Seller upon Seller's acceptance of this order. Seller's acceptance of this order is expressly limited to acceptance of the terms and conditions set forth herein, and no additional or different terms and conditions shall become a part of the agreement unless specifically agreed to in writing by Buyer's authorized representative.

*Id.* at PCI-00336.  PCI did not fax the back of the purchase order at this time.

PCI alleges, and ADC denies, that moments after faxing ADC purchase order numbered 47572, PCI again faxed ADC a purchase order numbered 47572.  This purchase order was identical to the first purchase order faxed on that date except that the numeral "6" in the delivery date of "6-30-04" was crossed out and a numeral "9" written slightly above the crossed-out term.  Documents at PCI-00843.  Unlike the purchase order faxed moments before the alleged transmittal of this second purchase order, the copy of the purchase order in the record contains no transmittal information bannered across the top of the document.[1]  Although Blain originally testified that he transmitted the purchase order to ADC with the delivery date of "9-30-04" on it moments after faxing the purchase order with the delivery date of "6-30-04," he later admitted that he could not be certain that the corrected purchase order was sent to ADC.   Deposition of Blain ("Blain depo."; Docket # 29), pp. 316-21.

PCI asserts that the corrected purchase order allegedly faxed on August 3, 2004 was accompanied by the following text on the reverse side of PCI's standard purchase

---

[1]  Blain claims that the page at Documents at PCI-00845 may be the transmittal information for the second transmission.  That document is an enlarged copy of the top of the corrected purchase order with information headed as a "Transaction Report" describing the transmittal as occurring at 12:09 p.m. on August 3, 2004, the same time as the transmittal of the first fax by PCI to ADC on that date.  The style of the fax information on the copy at Documents at PCI-00845 does not match the style of the fax information given on Document at 336, allegedly transmitted moments before the corrected document.

3

order form:

1.     **Purchase Order.**  This Purchase Order constitutes Buyer's offer to Seller, and becomes a binding contract upon the terms set forth herein when accepted by Seller either by acknowledgement or the commencement of performance hereof. No revision of this Purchase Order shall be valid unless in writing and signed by an authorized representative of Buyer; and no condition stated by Seller or in Seller's form which is inconsisitent with or in addition to the terms and conditions herein shall be binding unless expressly accepted in writing by Buyer.

\*          \*          \*          \*          \*

4.     **Inspection/Rejection.**      All goods and services supplied hereunder shall be received subject to inspection and rejection.  Defective or non-conforming goods will be held for Seller's account at its risk and if Seller so directs will be returned at Seller's expense.  Rejected goods shall not be replaced without a new order.  In addition, Seller shall reimburse Buyer for all costs reasonably incurred by Buyer resulting from or connected with the delivery of such defective or non-conforming goods or the failure to timely deliver conforming foods.  Seller acknowledges that the goods or services to be provided hereunder are an integral part of the performance by Buyer under the Principal Contract, and that late or defective delivery or performance by Seller may cause Buyer to default under the Principal Contract, in which case Buyer shall be obligated to pay damages, including liquidated or consequential damages.  Seller shall indemnify and hold harmless Buyer from such damages and expenses, including seller's fees, caused in whole or in part by Seller's late or defective delivery or performance.  Payment for goods or services prior to inspection shall not constitute acceptance thereof, nor will acceptance remove Seller's responsibility for defects.

5.     **Delivery.**  Time is of the essence on this order.  If delivery of the goods or performance of the services is not completed by the time specified herein, Buyer may (I) accept late delivery or (II) cancel the order in whole or in part without liability respecting any goods not delivered or services not performed.  In either case, Buyer shall be entitled to indemnification as otherwise provided in this Purchase Order, and otherwise paid its damages and other costs reasonably incurred on account of such delay.  Further, Buyer shall be entitled to exercise such other rights and remedies as it may have at law or in equity, including any right it may have to specific performance of this Purchase Order.

*Id.* at PCI-00365.  The reverse side of the standard PCI purchase order also provided that

payment from the general contractor was a condition precedent to PCI's obligation to pay

ADC.  ADC denies receiving a fax of the reverse side of PCI's standard purchase order at

4

any time on August 3, 2004.[2]

On August 5, 2004 Bill Perk ("Perk"), president of ADC, sent a letter to Blain.  The body of the letter read as follows:

> Per our telephone conversation this morning, the following is the requested breakdown of option #1 within our letter to you dated July 22, 2004.
>
> Original negotiated price................................................$174, 718.30
> Increase due to material escalations and grid.................$13, 983.94 (approx. 8%)
> Adder for panels #17 & #18 changing increasing by 2.5"..$3,118.05
> Total = $191,820.29
>
> Ron, kindly let me know if I can be of any additional assistance.

Letter from Perk to Blain, August 5, 2004, Pl. opp., Exh. D., p. 1.  Regarding the purchase order of August 3, 2004 and telephone call referenced in the August 5, 2004 letter, Perk testified as follows:

> Q.     So when you first received the purchase order in this case, the delivery date per the purchase order was 6/30/04?
>
> A.     Yes.
>
> Q.     Okay.  At the time do you recall having any discussions with anyone at PCI regarding the delivery date?
>
> A.     I had a discussion prior to this being faxed over to me with Ron Blain.
>
> Q.     And do you recall what was said by either of you in that conversation regarding delivery date?
>
> A.     Ron had called and he had stated that he just got approvals for the materials. We were expecting approval of materials originally back in March, and he didn't get it until this time.
>        So there was a delay in getting the approval, and that he felt under the gun and that he wanted to fax over a preliminary purchase order that would allow us to act on getting material going, and follow it up with a corrected

---

[2]  PCI alleges, and ADC does not deny, that ADC had previously received this reverse side of PCI's standard purchase order in connection with other jobs.

purchase order when he had time.

He state that he was under a lot of pressure, there were a lot of ramifications on this job, and it might be a couple of days or so before he gets back to it, and would we please go ahead with this, and I kind of accepted it as his letter of intent until, again, it was updated.

Q.    Okay.

A.    I told him  . . . we would, provided that he sent us a deposit for 35% of the agreed upon amount, which was approximately $200,000, and if we got a check for $70,000, we would provide it.

At that time he was talking about lead times, and I said to him that is something we'll have to develop because the marketplace has changed already, as I warned you in letters, and we will get back to you on ship dates.

Deposition of Perk ("Perk depo."; Docket #26), pp. 55-57.

ADC alleges that the parties later agreed to a purchase price for the materials for

the Green River project:

Q.    And you said that he told you that he would send you a preliminary purchase order, and would follow-up with a corrected purchase order, or a final purchase order?

A.    Correct.

Q.    Did you ever receive a final purchase order, or corrected purchase order?

A.    In writing, no.

Q.    Why do you clarify by saying in writing, no?

A.    Because verbally he said this is what we were going to do, and verbally we agreed to a dollar amount.

Q.    Okay.  You verbally agreed to a dollar amount.  Did you verbally agree to any other terms?

A.    I think there were some conversations between Ron and Bob Hamill in regards to various lead times, terms and other financial matters.

*        *        *        *        *

6

> Q.      Okay.  What was the dollar amount that was verbally agreed to?
>
> A.      It was, approximately, $192,000, and an additional $8,000, which was a variable depending upon how many shipments would be required.

Perk depo. at 58-59.  PCI forwarded to ADC a check for $70,000 dated August 11, 2004. ADC contends that this represented the 35% percent advance payment of the total purchase price required for non-standard goods.

Blain stated that he and Perk probably had telephone conversations in June or July of 2004 in which Perk told him that because of increases in the price of steel, the price of $174,557.00 originally quoted in ADC's bid would now have to be higher.  Blain depo. at 157-59, 161-62.  According to Blain, when Perk told him that the quoted price was no longer good because of increases in the price of steel, Blain said that he could not absorb those costs and that he would have to pass them on to the general contractor.  *Id.* at 158-59.  Blain contends that he then submitted a change order to the general contractor for the general contractor's approval of an increase in the cost of the tiles and suspension.  *Id.* at 157-58.  Blain met with the general contractor, the architect, and the owner about the material escalation costs after submitting the change order.  *Id.* at 159.  At that meeting Blain was told that because PCI was late with their shop drawings, submittals, and samples, the general contractor regarded the price escalation as PCI's fault and denied the request for a price escalation.  *Id.* at 163-66.

Robert Hammill ("Hammill"), an officer of ADC, faxed the following to PCI on September 7, 2004:

> EVERY FEASIBLE EFFORT IS BEING MADE TO SATISFY YOUR NEEDS ON THIS PROJECT.  BASED ON OUR QUOTED LEAD TIME AND OTHER PROJECT MILESTONES WE FEEL THAT PCI'S EXPECTATIONS MAY BE OVERLY OPTIMISTIC.

7

WE ORIGINALLY QUOTED 10 WEEKS LEAD TIME, WHICH IS PREDICATED ON RECEIPT OF COMPLETE TECHNICAL INFORMATION AND ANY DEPOSIT MONIES DUE.  WE RECEIVED DRAWING APPROVAL ON 7/22, YOUR PO ON 8/3, AND YOUR DEPOSIT CHECK ON 8/16.  WE SUBSEQUENTLY AGREED TO A 9-WEEK LEAD-TIME WHICH IS MID OCTOBER.

WE ARE ATTEMPTING TO EXPEDITE WHENEVER WE CAN BUT CAN ONLY DO SO MUCH GIVEN THAT THESE PRODUCTS GO THRU A SERIES OF PROCESSES THAT INVOLVE SET UPS AND QUEUE TIMES AS WE HAVE OTHER PRODUCTS IN HOUSE.

YOU HAVE REQUESTED A PARTIAL SHIPMENT OF GRID THIS WEEK BUT, BASED ON WHAT WOULD BE AVAILABLE, THIS SHIPMENT MAY NOT BE OF BENEFIT TO YOU IN TERMS OF BEING ABLE TO GET STARTED.  WE ALSO NEED TO GO ON RECORD THAT PARTIAL SHIPMENTS WILL INCUR COST NOT ONLY DUE TO INEFFICIENT FREIGHT RATES BUT ALSO INCUR ADDITIONAL SET-UPS IN OUR FACTORY AND DO NOT ALLOW US TO OPTIMALLY UTILIZE MATERIALS.   OUR QUOTATION WAS BASED ON ECONOMIES OF THE MOST EFFICIENT PRODUCTION OF THESE MATERIALS. OUR COSTS INVOLVED DUE TO PARTIAL SHIPMENTS WILL HAVE TO BE PASSED ON TO PCI.

I WILL GET YOU AN ESTIMATE ON EXPEDITED SHIPMENT LATER TODAY.  I WILL NEED WRITTEN AUTHORIZATION OF THE ADDITIONAL FREIGHT CHARGES FROM PCI PRIOR TO PROCEEDING.   I WILL NEED THIS AUTHORIZATION TO STATE THAT ADC UNDER NO CIRCUMSTANCES IS OR WILL BE EXPECTED TO ABSORB/PAY FOR OR CONTRIBUTE TO THIS ADDITIONAL COST.

BE ASSURED THAT WE WILL DO WHAT WE CAN BUT AN ORDER OF THIS MAGNITUDE AND COMPLEXITY REQUIRES LEAD TIME AS PREVIOUSLY QUOTED.

Documents at PCI-00354.

Hammill also faxed the following to Blain on September 7, 2004:

I talked to Ron + Bill on what we can do.  As I stated earlier our 9 weeks lead time started when we got dws approval/PO/deposit.  We obviously would base it on the last event, receipt of $$.  You seem to be working off the 1st date, dws approval. Spliting [sic] the difference, your PO is dated 8/3 + 9 weeks = 10/5/04.

We will commit to ship all by 10/5/04.  Should you desire we can partial ship grid but not all this week and NOT tomorrow.  I can hopefully get a skid full out by 9/10 Friday at following extra cost

> AM Mon. delivery $1,325$^{00}$
> PM Mon. delivery $1,200$^{00}$

> I will try to ship components necessary to allow you to finish the majority of an area but I <u>can't</u> guarantee I can complete an area.  Panels and cloudliner will ship 10/5/04.
>> This is what I can do.  If you have any written evidence we promised otherwise fax it to me and I'll make it happen.

*Id.* at PCI-00337-38.  ADC began shipping some components shortly after Hammill sent these faxes.

During September the contractor on the Green River project encountered problems because of a construction error on the project.  The contractor asked PCI if it could solve the problem by changing the size of one of the ceilings for which ADC was supplying ceiling tiles.  Blain faxed the following letter to Ron Barski ("Barski") and Dan Kusak ("Kusak"), two officers of ADC, on October 1, 2004:

> I have revised the panel sizes per the field dimensions we have taken on site.  It looks like we will have the same number of different panel sizes per lab typical.  We have just changed the sizes of the different panel types to the locations of the bulk head soffits.

> If we can adjust the panel sizes then all wall trims will be 1".

> Please call to confirm the changes to the panels will be something we can do as a no cost issue.  I understand that we have the material sheeted but no cut or perf'd at this time.  I will also need the following ASAP:

>> 1.  Confirmed ship dates for the Wood ceiling suspension and the curtain pocket.
>> 2.  Confirmed ship dates for the metal  and wood ceiling panels.
>> 3.  Costs for the shipping –ship on a dedicated truck to jobsite.

> We have a limited time to submit these costs to the Owner.  I need to have these costs today.  If I am out of the office then call me on my cell @ 206.423.2919.

*Id.* at PCI-00343 (punctuation and capitalization in the original).

Barski and Kusak responded to Blain's October 1, 2004 fax by a fax dated October

9

4, 2004:

>With reference to the wood panel dimension revisions you requested in you fax dated 10/01/04, we can make some, but not all size revisions.  As noted in our phone conversations, we have sheeted out material to produce specific sizes and quantities of panels from each sheet.  Pending receipt of your response to the fax I sent earlier today, we will make changes as noted below.
>Panels #1 and 2 will remain 48"x48" and 30"x48" respectively. (Why is 47-1/2" panel needed?)
>Panels #3 and 4 will be revised to 48"x33-7/8 and 30"x33-7/8 respectively.
>Panels #17 and 18 cannot be changed and will be supplied as originally drawn at 48"x38-1/2 and 30"x38-1/2.  This will result in a gap at the bulkhead of 3-1/2" at one end of the room and 2-5/8" at the other.  This gap could be closed with the 4" wide channel you requested.   This channel is available at a cost of $3.89 LF.  Approximately 80LF should be adequate.  No other trim should be required and this will leave a 1/2" reveal at the wall per plan.
>
>If we must revise torsion spring locations because of field modifications to the slotted cross-T's, there will be an additional charge of $250.00 for each panel size affected.
>
>Balance of grid and curtain pockets will ship on Wednesday, Oct. 5, 2004.
>Metal panels will ship 11/01/04 and wood panels will ship 11/15/04 pending approval of items noted above no later than Wednesday, Oct. 6, 2004.
>Dedicated truck charges are still being investigated.  Early responses indicate costs from $5500.00 to $7800.00 with varying degrees of service.  We find these costs excessive and will continue to get other quotes.

*Id.* at PCI-00346 (punctuation in the original).

>Blain faxed the following letter to Perk on October 7, 2004:
>
>In regards to the delivery dates for the metal and wood ceiling panels for the GRCC project.  The delivery dates stated in your October 4, 2004 correspondence, indicate ship dates of November 1, 2004 for the metal panels and November 15, 2004 for the wood panels.  This does not coincide with the previous commitments between PCI and American Decorative Ceilings and is unacceptable.
>
>We received and forwarded the final approved shop drawings to you on July 22, 2004, and a Purchase order was sent on August 3, 2004, stating a required delivery date of September 30, 2004.  This date was a reflection of the 8-week lead-time reflected on your quote.  At that time a deposit was requested prior to production.  The process of sending the deposit check of that size would take some time.  With that said PCI and American Decorative  agreed that final preparation of the shop drawings and material orders would be placed in good faith as not to lose any time

10

in production.  PCI then requested a ship date for the suspension system and for the wood and metal panels.  In a phone call on July 15, 2004 Ron Barski confirmed the suspension system for the metal and wood ceilings would ship on September 10, 2004 and the panels would ship on September 24, 2004.  This was enough time to arrive before the requested dates.

After numerous attempts to verify that we were on schedule for the delivery date of September 24, 2004 we received a correspondence dated September 7, 2004 from Bob H.  This correspondence stated that American Decorative cannot meet the September 24 ship date, but can commit to ship all materials by October 5, 2004.  Although this does not meet the original ship date it is a date we could have worked with.

Per your latest correspondence dated October 4, 2004 the new proposed ship dates have slipped an additional 4-6 weeks.  This is unacceptable.  In relaying this information to our customer we have been put on notice of delay damages and/or liquidated damages in excess of $2000.00 per calendar day starting November 2, 2004.  (See attached letter from Graham Contracting)  This means we must have our installations complete by October 15, 2004.  This letter shall serve as notice that these costs are being tracked against your account.

We must have you respond with your plan of action by 4:00 EST on October 8, 2004 in order to allow us time to respond to our customer.

*Id.* at PCI-00351 (punctuation in the original).

On October 8, 2004 Hammill faxed the following letter to Blain:

On 9/7 we indicated ADC would ship panels and cloudliner by 10/5/04 based on our earlier telephone conversations.

Since then we have been told by PCI to stop manufacturing as soffits were in the wrong place, field dimensions supplied earlier were incorrect, and you might want us to ship panels with 1 side unformed.  We were obviously concerned with this change of events in that our panels were intended to be field accessible and any field revisions could effect [sic] their removability.  We requested an approval letter from the architect allowing these field cuts which due to further change in plan by PCI became a non-issue but delayed manufacturing progress.  This early October revision to panel sizes needs to be approved by PCI in writing.  We have reacted to several verbal requests for which we requested written confirmation, which we did not receive.  We are leery to proceed without confirmation that we have final information and dimensions.

We were also told that grid had been field cut different [sic] than as shown on our drawings, which may hinder the proper installation of our panels.

11

We have been waiting for a final agreement that this is the way PCI and ADC are going to proceed as we are obviously concerned that once metal is fabricated further changes are costly or impossible to make.

We understand the complexity faced by PCI in the engineering and constructing of a facility.  We would hope that PCI would realize that the series of changes/potential changes and holds that we have been asked to respond to since my fax of early September have impacted our ability to meet an early October ship.  We have faxed you our intention to ship in early and mid November.  We obviously will do our best to do better given your situation but will not accept any financial penalties as the delays are a result of the series of revisions/potential revisions and changes in field dimensions recently conveyed to us.

*Id.* at PCI-00356.

On November 1, 2004 PCI faxed ADC purchase order number 47572 in the amount of $4,390.90 for wood panels, springs, acoustical backing, tees, and set up fees for the Green River project.  The delivery date was November 28, 2004.  Later that day ADC sent PCI's office in Woodinville, Washington an invoice for $128,461.93, the balance due on the Green River project, according to ADC, after adding the additional $4,390.90 and deducting the $70,000.00 deposit paid.  A paragraph above the space for the recipient's signature stated,

PLEASE SIGN AND RETURN THE ORIGINAL COPY OF THIS ACKNOWLEDGEMENT [sic] TO AMERICAN DECORATIVE CEILINGS (ADC) AS SOON AS POSSIBLE.  IT WILL BE CONSIDERED YOUR PURCHASE ORDER AND TOTAL AGREEMENT W/ ADC FOR THIS ORDER. IT IS IMPERATIVE THAT WE RECEIVE THIS ACKNOWLEDGEMENT [sic] AS SOON AS POSSIBLE SO THERE IS NO DELAY IN PROCESSING AND EXPEDITING YOUR ORDER.

*Id.* at PCI-00366.  PCI did not sign and return the invoice.

During 2004 ADC was also supplying material to PCI for a second job at Pierce College.  Disputes developed regarding payments to ADC for the Pierce College job.  On November 2, 2004 Hammill faxed the following to Blain:

I have to insist on receipt of a check for Pierce College prior to shipment of Green

12

River panels.  We shipped Pierce College panels air freight as instructed by PCI and now find out we may not be reimbursed for our expense.

We regret have to proceed [sic] this way but have to protect our interests.

AS DISCUSSED, THE AMOUNT OF THE check is to be the amount not in dispute ($32945.81) WITH THE UNDERSTANDING PCI WILL RESOLVE THIS SHORTLY.

*Id.* at PCI-00367 (typeface in the original).  PCI  sent ADC a check for $32,950.81 dated November 3, 2004.

ADC substantially completed the manufacture of the metal ceiling panels for the Green River project on November 8, 2004.  On November 15, 2004 Hammill faxed the following to Blain:

As you are aware we have shipped the material which is a full truckload for the Green River project.

Said truck should be in the Seattle area shortly.

As we are still in dispute over Pierce College transportation expenses, I will need an official check/cashiers [sic] check for $99,000- in our possession prior to final delivery of this portion of the project.

I regret the inconvenience this poses but I have to protect the company's financial interests.

Documents at PCI-00370.  On November 19, 2004 PCI faxed a response to ADC:  "Not happy about this.  Please give us a call."  *Id.* at PCI-00376.  That same day Hammill talked with  Vaughan Grubaugh ("Grubaugh"), Operations Manager for PCI, and faxed Mark Eisenman, an officer of PCI, the following letter:

This letter is to confirm my conversation with Vaughan Grubaugh earlier this morning.  American Decorative Ceilings (ADC), is requesting an Official Bank check or Bank Cashier's check in the amount of $99,000.00.  Upon receipt of the funds of this check, ADC will arrange for delivery of the metal panels within approximately 24 hours of same.  If ADC receives a PCI or PCG check, kindly be advised that we will have to wait until funds transfer before making arrangements to deliver the metal panels.

13

It is ADC's intent to work out our differences with PCI on the remaining balance. It is unfortunate for all parties that these discrepancies exist. This coupled with the fact that ADC would like to continue doing business with PCG and PCG has stated it wants to reciprocate will lead to good faith resolution.

With regards to the remaining wood panels, ADC expects to be shipping these this coming Wednesday, 11/24/2004. However, if ADC does not receive the $99,000.00 funds by Monday 11/22/2004, these panels will ship proportionately later. Should you have any questions, comments, or concerns, kindly contact me at your convenience.

*Id.* at PCI-00378 (punctuation in the original).

On November 23, 2004 Hammill faxed Ken Snyder of Graham Construction the following explanation of the problems between PCI and ADC regarding materials for the Green River project:

ADC's first preference was to try to work out our differences with Performance Contracting so that the metal panels could be released for delivery to the jobsite for this project.

After several days of back and forth discussions, ADC was to fax an invoice to PC for the amount to be paid for this delivery, and provide PC with a letter stating what we were committed to doing with them. Both of these were done on Friday 11/19/04, which was three days longer than it should have been.

PC was to overnite a bank check, for delivery to ADC on Monday (11/22/04) a.m. This did not happen. Yesterday, 11/22/04 Roger of PC stated that he had said check and wanted to present it to our warehouseman when the metal panels were to be picked up. This was not and is not what we agreed to on Friday 11/19.

ADC does not believe that PC is negotiating in good faith and wonders that if material is so desperately required, why we have so much time to negotiate with. Apparently there must be a greater amount of time left in the schedule to install these panels then [sic] what ADC has been and is being pushed for.

Because of an earlier conversation with you indicating that ADC was hoping to ship the wood panels this Wednesday, based in whole on its optimistic expectations of achieving a working solution with PC, ADC wants you to know that this has been delayed. ADC has temporarily pulled off of finishing the wood panels until this matter has been resolved.

In this earlier conversation, you stated that you had the binding authority to take

14

over the purchase of these materials.  If this is accurate, and you would still like to persue [sic] this option, can you please provide written confirmation of this to ADC?

Kindly contact me with any questions, comments, or concerns that you may have.

*Id.* at PCI-00380.

The relationship between PCI and ADC broke down completely at the end of November.  On November 29, 2004 Grubaugh sent the following to Perk:

As you know, PCI has been attempting to obtain the pre-ordered steel decorative ceiling materials and wood ceiling materials for the [Green River] project for several weeks.  Over the past two weeks, American Decorative Ceilings has demanded that PCI pay $99,000 in advance before receiving the steel decorative ceiling material in the form of a cashier's check.  We were also advised that the materials were in a bonded warehouse.

Since we are not accustomed to doing business as proposed and we do not understand why you would request a cashier's check for payment in advance, we advised Bob [Hammill], one of your employees, that we would only provide a cashier's check if we were first given an opportunity to inspect all of the materials while the "bonded warehouseman" held the cashier's check.  We received a phone message from him indicating that you would not allow us to review the materials, that the materials were actually being held by a friend rather than in a bonded warehouse and that you did not want to involve the friend in financial issues.

To put it bluntly, this is an unacceptable response and this is not a manner in which we are willing to do business.  As I am sure you are aware, this is a public project, the general contractor has a bond on the project, and PCI is a sizeable company that has been in business for over 25 years.  Under these circumstances, there is virtually no reason for you to demand payment in advance as there are many ways you can obtain payment should PCI fail to pay as agreed.

Because we do not believe that paying in advance with a cashier's check without an opportunity to review the materials first is a prudent manner of doing business, we decline to proceed as you have suggested.

PCI will complete this transaction under the following conditions:  (1) PCI is given the materials in advance of payment and provided two days to inspect the materials to determine if they conform to the original specifications; (2) upon completion of our inspection, we will provide you with a check in the sum of $99,000 drawn on PCI's ordinary business account; (3) we expect delivery of the wood materials in a timely fashion without any further shipping requirements.  Upon confirmation, we will proceed with payment and inspection as outlined above for the steel materials.

Please confirm in writing that you will release the materials no later than Wednesday, December 1.  If we do not receive written confirmation from you that the materials have been released by that date, we will make other arrangements to obtain the materials and will look to your company for recovery of all costs and damages incurred.

This transaction is governed by the Uniform Commercial Code, which specifically provides for a purchaser in our position to recover all consequential damages suffered as a result of your imposition of new and unagreed upon conditions precedent to delivery of the materials.  We anticipate that the ultimate cost of resolving this, should we be required to obtain the materials from another supplier, will exceed $500,000, and we fully intend to prosecute this claim to the fullest extent and collect all those funds from your company should that be necessary.

We sincerely hope this will not turn into a dispute between our companies as we have done business with you in the past and would do business with you in the future if we can resolve this.  If we cannot, we will not hesitate to vindicate our legal position.

*Id.* at PCI-00383-84.

Hammill responded to Grubaugh's letter of November 29, 2004 with a letter on

November 30, 2004:

Thank you for taking the time to explain your position regarding the above project. As was stated to Ron Blain, Mark Eisenmann, and yourself in conversations earlier than 11/19/04, and finally confirmed in my letter to Mark 11/19/04 (per your request), the Woodinville branch of PCI is on credit hold for actions of its doing.  PCI could always have mitigated its potential damages by sending the funds indicated in the 11/19/04 letter.  Upon receipt of the funds of this check, ADC will arrange for delivery of the metal panels within approximately 24 hours of same.  If ADC receives a PCI or PCG check, kindly be advised that we will have to wait until funds transfer before making arrangements to deliver the metal panels.

It is ADC's intent to work out our differences with PCI on the remaining balance.  It is unfortunate for all parties that these discrepancies exist.  This coupled with the fact that ADC would like to continue doing business with PCG and PCG has stated it wants to reciprocate will lead to good faith resolution.

With regards to the remaining wood panels, ADC expects to be shipping these this coming Wednesday, 11/24/2004.  However, if ADC does not receive the $99,000.00 funds by Monday 11/22/2004, these panels will ship proportionately later.  Should you have any questions, comments, or concerns, kindly contact me at your convenience.

16

*Id.* at PCI-00378.

On December 6, 2004 Grubaugh sent the following letter to Perk, terminating the

contract between ADC and PCI:

> This is notice of termination of the purchase order for the Green River Community
> College Project (PCI #47572) for default.
>
> As you know, under the terms of the purchase order, you were required to deliver
> the material on or before September 30, 2004, FOB jobsite with payment due 45
> days after delivery.  You have failed to timely ship the goods and failed to comply
> with the terms of the purchase order and have instead refused to make delivery
> unless full payment is received in advance.  Pursuant to the terms of the Uniform
> Commercial Code as adopted in Ohio and Washington, PCI, as the buyer, is entitled
> to inspect all goods before making payment.  As an accommodation to you, on
> November 29, 2004 PCI offered to make payment within two days of inspection of
> the goods, but you refused.
>
> Because of the multiple defaults by you, PCI has elected to terminate the purchase
> agreement and make cover by obtaining the materials from an alternative supplier.
> Because you failed to comply with your obligations, PCI will incur additional
> expenses and there may also be substantial consequential damages.  If PCI suffers
> any damage as a result of your breach, it will seek recovery from you.
>
> Please immediately return the deposit of $70,000.

*Id.* at PCI-00386.

An attorney representing ADC, Robert J. Belinger ("Belinger"), responded by letter

dated December 7, 2004 to PCI's termination of the contract.  Belinger's letter read in

relevant part:

> It appears that you have never signed or acknowledge [sic] the final order.  If my
> client completes the shipment he has no paperwork to fall back on in the event the
> full amount is not tendered on receipt.  If you recall there remains an outstanding
> balance on the Pierce College job for the very same reason.  My client is unwilling
> tp proceed without full documentation and I believe, within his rights to hold
> shipment until that matter is resolved.  It is you who requested changes to the
> original order not my client.  If you desire to precede [sic] on the final order only you,
> along with a representative of Graham can visit the storage facility, spot check the
> materials and forward a check for the balance due.  Upon receipt and clearing of the
> check my client will immediately authorize the release of the materials at the facility

17

and ship the remaining wood panels within Fourteen (14) days.

*Id.* at PCI-00387 (punctuation and capitalization in the original).  PCI declined the terms specified in Bellinger's December 7, 2004 letter and instead obtained the needed materials from other sources.

ADC filed an action for breach of contract against PCI in the Court of Common Pleas, Cuyahoga County, Ohio.  PCI removed the state action to federal court on March 4, 2005 and filed an answer and counterclaim on March 9, 2005.  PCI now seeks summary judgment on ADC's complaint and partial summary judgment as to liability on its counterclaim.

## II.  Summary judgment standard

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U. S. 317 (1986).  The substantive law of the case identifies which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party must demonstrate to the court through reference to pleadings and discovery responses the absence of a genuine issue of material fact.  *Id.* at 323.  The nonmoving party must then show the existence of a material fact which must be tried.  *Id.* at 324.

When evaluating a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to . . . the party opposing the motion . . . ."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962); *Aetna Ins. Co. v. Loveland Gas & Elec. Co.*, 369 F.2d 648 (6th Cir. 1966).  This includes taking the nonmoving party's uncontradicted allegations as true and giving the benefit of the doubt to

18

the nonmoving party's assertions when they conflict with those of the movant.  *Bishop v. Wood*, 426 U.S. 341 (1976); *Bosely v. City of Euclid*, 496 F.2d 193, 197 (6th Cir. 1974).

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e).  *See Celotex,* 477 U.S. at 324.  The nonmoving party may oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves. . . ,"  *id.*, or by any other evidentiary material admissible at trial. *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993); *see also* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, 10A, § 2721 (1998).  Conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes.  *Lujan v. National Wildlife Fed'n*, 497 U.S. 871 888-89 (1990).  There must be enough evidence that a reasonable jury could find for the nonmoving party.  *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989).

### III.  Choice of law

Either Ohio state law or Washington state law are potentially applicable to ADC's claims.  PCI asserts, and ADC does not deny, that because both Ohio and Washington have adopted the Uniform Commercial Code ("UCC"), there is no substantive difference between the relevant laws of the two states.  PCI concedes, therefore, that the court may apply Ohio law in determining the merits of ADC's complaint.  ADC does not claim that the application of Ohio law in the instant case would be erroneous.

A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state.  *Klaxon v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941);

19

*International Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 604 (6th Cir. 1996).  The court therefore must apply Ohio choice of law rules to determine which state's substantive law should govern the case.

Ohio law provides that "the parties may agree that the law either of this state or of the other state or nation shall govern their rights and duties." OHIO REV. CODE. § 1301.05. No party has  referenced choice of law provisions in the relevant contracts.  The court will assume, therefore, that such provisions do not exist or that the parties do not wish to rely on them.

Where the parties have not agreed beforehand as to which law shall govern disputes, Ohio has adopted the approach of the Restatement (Second) of Conflict of Laws in determining which law to apply.  *GBJ Corp. v. Eastern Ohio Paving Co.*, 139 F.3d 1080, 1085 (6th Cir. 1998);  *Lewis v. Steinreich*, 73 Ohio St. 3d 299, 652 N.E.2d 981, 984-85 (1995).  This approach requires a court deciding a cause of action in contract to apply the law of the state with the most significant relationship to the contract.  *International Ins. Co.*, 86 F.3d at 604;  *National Union Fire Ins. Co. v. Watts*, 963 F.2d 148, 150 (6th Cir.1992). Contacts to be taken into account to determine applicable law include: place of contracting; place of negotiation of contract; place of performance; location of subject matter of contract; and domicile, residence, nationality, place of incorporation, and place of business of the parties.  *International Ins. Co.*, 86 F.3d at 605; *Gries Sports Enters,, Inc. v. Modell*, 15 Ohio St. 3d 284, 473 N.E.2d 807, *cert. denied*, 473 U.S. 906 (1984).

In the instant case the contract in dispute was negotiated and formed in both Washington and Ohio.  ADC is an Ohio corporation; PCI is a Kansas corporation.  The place of performance of the contract is both Ohio and Washington.  The subject matter of

20

the dispute, the undelivered ceiling tiles, is in Ohio.  The court concludes, therefore, that application of Ohio law in this case is at least reasonable on its face and will not inquire further into the matter.

### IV.  Breach of contract

ADC alleges that PCI breached the contract between them by refusing to pay for the ceiling panels it ordered from ADC.  PCI denies that it breached the contract because when PCI refused to pay for the ceiling tiles, the contract had been voided by ADC's breach of the contract by failing to deliver the ceiling tiles timely and by demanding payment on terms other than those contained in the contract.

*A.*  *Contracts for the sale of goods under Ohio law*

Chapter 1302 of the Ohio Rev. Code adopts the provisions of the UCC governing contracts for the sale of goods.  The requirements of Ohio law and the UCC for the formation of a contract are not onerous:

> (A) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
>
> B) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
>
> C) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Ohio Rev. Code §1302.07.  An offer to form a contract may be accepted in any manner and by any medium reasonable under the circumstances unless the offer or circumstances unambiguously indicates otherwise.  Ohio Rev. Code §1302.09.

An acceptance or confirmation that contains terms different from or in addition to

those in the offer does not necessarily void the offer:

>    (A) A definite and seasonable expression of acceptance or a written
> confirmation that is sent within a reasonable time operates as an acceptance even
> though it states terms additional or different from those offered or agreed upon,
> unless acceptance is expressly made conditional on assent to the additional or
> different terms.

>    (B) The additional terms are to be construed as proposals for addition to the
> contract.  Between merchants, the terms become part of the contract unless one of
> the following applies:

>    (1) The offer expressly limits acceptance to the terms of the offer.

>    (2) They materially alter it.

>    (3) Notification of objection to them has already been given or is given within
> a reasonable time after notice of them is received.

>    (C) Conduct by both parties that recognizes the existence of a contract is
> sufficient to establish a contract for sale although the writings of the parties do not
> otherwise establish a contract.  In such case, the terms of the particular contract
> consist of those terms on which the writings of the parties agree, together with any
> supplementary terms incorporated under any other provisions of Chapters 1301.,
> 1302., 1303., 1304., 1305., 1307., 1308., 1309., and 1310. of the Revised Code.

Ohio Rev. Code §1302.10.  The course of performance between the contracting parties is relevant to determining the meaning of the contract or to showing waiver or modification, unless the performance indicates a construction of the contract which is unreasonable given the express terms of the contract.  Ohio Rev. Code §1302.11.

Under some circumstances, a contract may be formed without the inclusion of a price term in the agreement:

>    (A) The parties if they so intend can conclude a contract for sale even though
> the price is not settled.  In such a case the price is a reasonable price at the time for
> delivery if:

>    (1) nothing is said as to price;  or

>    (2) the price is left to be agreed by the parties and they fail to agree;  or

(3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and if it is not so set or recorded.

(B) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

(C) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price.

(D) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract.  In such a case the buyer must return any goods already received or if unable to do so must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account.

Ohio Rev. Code §1302.18.[3]

Unless the contract specifies otherwise, payment for goods is due at the time and place at which the buyer is to receive the goods, but the buyer has the right to inspect the goods before proffering payment.  Ohio Rev. Code §§1302.23, 1302.57.[4]  A seller is required to tender delivery of the goods to the buyer before the buyer is obligated to pay for them.  Ohio Rev. Code § 1302.51.

If a seller has reasonable grounds to believe that the buyer's ability or willingness to pay may be impaired, the seller may demand from the buyer adequate assurance of performance:

---

[3] In the instant case, the parties may never have reached agreement as to the price term.  Neither party argues, however, that they failed to form a contract.

[4] The only exceptions recognized by Ohio law to the buyer's right to inspect the goods are when the goods are delivered C.O.D. or delivered "for payment against documents of title, except where such payment is due only after the goods are to become available for inspection."  *See* Ohio Rev. Code § 1302.27(C).

23

(A) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(B) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(C) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

(D) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

Ohio Rev. Code § 1302.67.

A contract for the sale of goods imposes on the seller the obligation to transfer and deliver the goods in accordance with the contract and imposes on the buyer the obligation to accept and pay in accordance with the contract. Ohio Rev. Code § 1302.14. A breach of contract occurs when a party demonstrates (1) the existence of a binding contract or agreement, (2) the non-breaching party performed its contractual obligations, and (3) the other party failed to fulfill its contractual obligations without legal excuse. *See National City Bank v. Erskine & Sons*, 158 Ohio St. 450, 110 N.E.2d 598 (1953); *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App. 3d 95, 108, 661 N.E.2d 218, 226 (1995); *Cairns v. Ohio Sav. Bank,* 109 Ohio App. 3d 644, 647, 672 N.E.2d 1058, 1060 (1996). "Upon the breach of an agreement, the law infers damages, and if none are proved, nominal can be recovered." *The First Nat'l Bank of Barnesville v. The Western Union Tel. Co.*, 30 Ohio St. 555, 568, 1876 WL 210, **8 (1876) (citations omitted); *see also The Toledo Group, Inc. v. Benton Indus., Inc.*, 87 Ohio App. 3d 798, 807, 623 N.E.2d 205, 211 (1993).

24

B.     *Breach of the contract between PCI and ADC*

ADC alleges in its complaint that PCI breached its contract when PCI failed to pay ADC for the ceiling tiles and related equipment ordered in connection with the Green River Project.  PCI alleges in its motion for summary judgment that it was not obligated to pay ADC because ADC had already breached the contract by failing to perform the contract pursuant to the terms of PCI's purchase order by failing timely to deliver the ceiling tiles, by demanding payment prior to delivery, and by refusing to allow PCI to inspect the goods before accepting them.  PCI moves for summary judgment on ADC's complaint and for partial summary judgment as to liability on PCI's counterclaim.  The court will consider the various breaches in the order in which they are alleged to have occurred.

A.     *Whether ADC breached the contract by late delivery of the ordered materials*

PCI claims in its motion for summary judgment that ADC breached its contract by failing to deliver the requested materials timely.  PCI raises various dates as the appropriate deadline for "timely" delivery, but it primarily asserts October 5, 2004 as the delivery date to which ADC committed itself.

PCI's claim is not well taken.  Even if it is assumed that October 5, 2004 is the deadline to which ADC committed itself for delivery of the goods, PCI's request for alterations in the requested goods eliminated any obligation on the part of ADC to provide the goods on that date.  By its fax of October 1, 2004 PCI requested a modification of the contract by requesting an alteration in the sizes of some panels.  ADC responded by fax on October 4, 2004 that the alterations would require certain delivery dates, later than the October 5, 2004 delivery date.  Blain's fax to Perk on October 7, 2004 noting that ADC's new delivery dates did not coincide with the original delivery date ignores the fact that the

25

requested modifications nullified the original delivery dates.  There is no indication in the record that the parties ever reached agreement regarding the delivery dates for the modified goods.[5]  Absent agreed-upon delivery dates, PCI cannot argue that ADC's promised delivery was untimely.

For this reason the court rejects PCI's claim that ADC breached its contract by failing to deliver the requested materials timely.

B.    *Whether ADC breached the contract by demanding payment prior to delivery*

PCI alleges that ADC breached the contract for the Green River project on November 19, 2004 when it asserted that it would not deliver ceiling panels until PCI paid $99,000 by cashier's check in advance for the panels.  ADC responds that it did not breach the contract by demanding the cashier's check prior to delivery because it had good reason to doubt PCI's willingness to pay ADC the full amount for the ceiling tiles and, therefore, was entitled to demand adequate assurance of payment from PCI.

Whether the parties rely on the reverse side of PCI's standard purchase order for the terms of their contract or on the UCC as found in Ohio's statutes,[6] PCI was entitled to

_____

[5] It is worth noting that ADC would have been well within its rights if it had produced the ceiling panels according to the original specifications and demanded that PCI pay for them.  Instead, ADC tried to accommodate the requested modifications despite PCI's unrealistic and unreasonable demands.

[6] ADC denies that the terms on the reverse side of PCI's standard purchase order are part of the contract between the two because PCI failed to transmit the reverse side of the purchase order to ADC on August 3, 2004 when it ordered the ceiling tiles.  PCI admits that it did not fax the reverse side of the purchase order when it first faxed ADC on August 3, 2004, but it claims that it sent the reverse side when it again faxed the purchase order to ADC moments after the first fax on that date.  PCI also argues that, in any case, ADC was familiar with the terms on ADC's standard purchase order and Perk had read those terms within days of the August 3, 2004 fax transmission.  Whether the terms on the reverse side of PCI's standard purchase order are considered part of the contract makes

26

tender of the ceiling tiles and an opportunity to inspect them before ADC was entitled to payment. The reverse side of PCI's purchase orders makes clear that payment to suppliers will occur only after PCI inspects the goods and receives payment from the general contractor. Documents at PCI-00365. Ohio law specifies that a buyer has the right to inspect the goods before proffering payment and that a seller is required to tender delivery to the buyer before the buyer is obligated to pay for them. Ohio Rev. Code §§1302.23, 1302.51. ADC had a right to a prior payment of 35% of the price of the tiles, a right reserved by its bid of October 31, 2003. *See* Documents at PCI-00327. Otherwise, ADC had no right pursuant to any contract between PCI and ADC or under Ohio law to demand any payment prior to tender of the goods to PCI and PCI's inspection of those goods. Thus, by demanding a cashier's check for $99,000 prior to tender of the ceiling tiles to PCI, ADC breached its agreement with PCI.

ADC asserts that it had good reason to doubt that PCI would pay ADC in full for the ceiling tiles given PCI's failure to send ADC a revised purchase order for the Green River job reflecting the entire purchase price of $200,000, PCI's failure to pay ADC all sums that ADC believed were due it on the Pierce College job, and conversations with other suppliers that indicated PCI did not always pay all sums owed its suppliers. *See* Perk depo. at 125-26, 128-29. ADC argues, therefore, that it was entitled to demand a check for $99,000 from PCI prior to tender of the goods because Ohio Rev. Code § 1302.67 gives it the right

---

no difference to the outcome of this case, however. If those terms were not part of the contract, then the terms of the UCC as enacted by the state of Ohio govern the conditions precedent to PCI's obligation to pay ADC. As the following discussion makes clear, ADC breached the agreement by demanding payment prior to tender of the goods whether the terms on the reverse side of PCI's standard purchase order are considered part of the contract between PCI and ADC or not.

under these circumstances to demand adequate assurance of payment.

ADC errs.  ADC did not demand "adequate assurance of payment" from PCI; ADC demanded the payment itself.  An "assurance" is "[t]he act or action of assuring; *e.g.* a pledge; guaranty, or surety.  A declaration tending to inspire full confidence."  BLACK'S LAW DICTIONARY, 5th ed., 113 (West 1979).  ADC told PCI that it had to give ADC a check for $99,000 before it would release the ceiling tiles because "we are still in dispute over Pierce College transportation expenses," Documents at PCI-00370, and because "the Woodinville branch of PCI is on credit hold for actions of its doing," *id.* at PCI-00378.  ADC did not clearly state that it was concerned that PCI was unwilling to pay in full for the goods for the Green River Project.  In sum, ADC asked PCI for payment for the portion of the order that ADC was ready to deliver,[7] not for an "assurance" about anything.

ADC's demand for a $99,000 check not only ignored PCI's right to tender prior to payment, it also ignored PCI's right to inspect the goods.  ADC attempts to justify this by asserting that PCI wanted an inspection with only representatives of PCI present and that the last time PCI did this it took the goods without proffering payment.  But had ADC wanted an "assurance" of payment, it could have insisted that PCI give the required check to a bondsman with instructions to release the check upon tender, inspection, and approval of the goods.  This would have assured ADC of payment while protecting PCI's rights to tender and inspection.  ADC could also have asked PCI for some other assurance

---

[7] The check for $99,000, added to the check for $70,000 already sent by PCI, would have given ADC the great bulk of the total payment for the order, whether the total amount of the order is $174,557, as PCI contends, or about $200,000, as ADC contends.  After payment for and delivery of the metal ceiling tiles, some of the wood panels ordered by PCI would have remained for future shipment.

28

satisfactory to ADC that would have protected PCI's rights.  ADC did neither of these things.  By demanding payment rather than assurance, ADC overreached.  It ignored PCI's rights under the contract and under Ohio law and breached its contract with PCI.

For the above reasons the court grants PCI's motion for summary judgment as regards ADC's cause of action against PCI for breach of contract.

C.      Whether PCI breached its contract with ADC

ADC claims that PCI breached the contract by failing to pay ADC for the tiles.  This claim is without merit.

ADC's action against PCI for breach of contract is without merit because ADC had failed to perform its contractual obligations at the time of the alleged breach.  Ohio law requires a party alleging breach of contract to demonstrate that at the time of the breach it had performed its contractual obligations.  ADC failed to perform its contractual obligations at the time of PCI's alleged breach because it had not fulfilled its obligations to tender the goods and give PCI an opportunity to inspect them.

ADC's cause of action for breach of contract also cannot succeed because Ohio law requires ADC to show that PCI failed to fulfill its contractual obligations without legal excuse.  As Ohio law provides that a seller is required to tender delivery of goods to the buyer before the buyer is obligated to pay for them, PCI had a legal excuse for not paying ADC prior to tender.  ADC's claim against PCI for breach of contract is, therefore, without merit.

For the above reasons the court grants PCI's motion for summary judgment as regards PCI's motion for partial summary judgment on its counterclaim and finds ADC liable to PCI for breach of contract.

29

III

For the reasons given above, the court grants PCI's motion for summary judgment as regards ADC's cause of action against PCI for breach of contract and dismisses ADC's complaint with prejudice.  The court also grants PCI's motion for partial summary judgment on its counterclaim by finding ADC liable to PCI for breach of contract.  The case will proceed to trial on the issue of damages; a Trial Order will issue promptly.

**IT IS SO ORDERED.**


Date:  August 16,  2006                        /s/Patricia A. Hemann
                                               Patricia A. Hemann
                                               United States Magistrate Judge

30